# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| ELMO AUGUSTUS REID, *Plaintiff,* <br><br> v. <br><br> HAROLD CLARKE, *ET AL.,* <br><br> *Defendants.* | CIVIL ACTION NO. 7:16-cv-00547 <br><br> <u>MEMORANDUM OPINION</u> <br><br> JUDGE NORMAN K. MOON |

This is an Eighth Amendment case against several officials of or involved with the Virginia Department of Corrections (VDOC). Plaintiff Elmo Reid alleges that the defendants have violated the prohibition on cruel and unusual punishment by failing to treat his infection for Hepatitis C (Hep C). The Court previously denied two defendants' motion to dismiss the Eighth Amendment claim. Now, three other defendants seek dismissal of the claims against them. Those defendants are: Fred Schilling, who previously served as Health Services Director for VDOC; N.H. Scott, VDOC's current Deputy Director of Administration; and Dr. Richard Sterling, chief herpetologist at VCU who oversees its Telemedicine Clinic (the Clinic).

The motions will be granted. Defendant Schilling is no longer employed by VDOC, so the non-monetary relief sought against him is moot. The claims against Defendant Dr. Sterling fail on the merits because he is not involved in the denial of Plaintiff's treatment: As an outside physician, Dr. Sterling can only treat who VDOC refers to him, and VDOC has not referred Plaintiff. Finally, Defendant Scott presents the closest question. Based on the pleadings and the arguments advanced in Plaintiff's brief, the Court concludes that the claims against him must be dismissed. The complaint does not sufficiently alleged Scott had actual knowledge of Plaintiff's condition such that Scott could have been deliberately indifferent.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim. The Court must take all facts and reasonable inferences in favor of the plaintiff, disregard any legal conclusion, and not credit any formulaic recitation of the elements. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 557 (2007)).

## FACTS ALLEGED

The gist of the complaint is that VDOC has refused to provide Plaintiff adequate medical treatment for his Hep C infection. Specifically, Plaintiff contends that there are available, effective direct-acting antiviral drugs (DAADs) that are the medical standard of care for Hep C. Instead of being referred by VDOC to VCU's Telemedicine Clinic for treatment by Dr. Sterling and access to DAADs, Plaintiff has not been referred to the Clinic and has not received any DAADs.

Plaintiff was diagnosed with stage-4 Hep C, the most advanced stage, in 2013. He has had the disease in some form since around 1988. His initial requests for treatment in 2014 were met with statements that treatment guidelines were in development. Some level of treatment was resumed by VDOC about June 2015. Around this time, DAADs became approved by the FDA, and the American Association for the Study of Liver Disease (AASLD) states that DAADs cure Hep C ninety-nine percent of the time.

There have been four interim rules imposed by VDOC regarding Hep C treatment—one each in February 2015, June 2015, October 2015, and June 2016. For completeness, the Court recounts the allegations relevant to each of these editions.[1]

The February 2015 Guidelines were developed by Defendant Dr. Mark Amonette (VDOC's chief physician) and approved by Schilling and Scott. Dr. Sterling "later commented on" them. These Guidelines prioritized offenders with more advanced Hep C based on testing, and indicated VDOC was planning to coordinate treatment through VCU's Clinic using certain federal guidelines. The February 2015 Guidelines had "exclusion criteria," among them (1) prisoners with less than a year on their sentence at the time treatment would start or (2) whose platelet test scores ("APRI") did not exceed 0.7. Dr. Amonetete developed and Schilling and Scott approved the exclusion factors. "Only [Dr.] Amonette [could] make the decision to refer an inmate to" the Clinic.

The June 2015 Guidelines were developed by Dr. Amonette and Dr. Sterling, and approved by Schilling and Scott. The treatment exclusion criteria were reduced to prisoners with nine months left on their sentences, and the test score criteria were adjusted to create a sliding scale based on two different tests.

The October 2015 Guidelines also were developed by Dr. Amonette and Dr. Sterling, and approved by Schilling and Scott. Dr. Amonette and Dr. Sterling removed any reference to the federal guidelines for treatment. The October 2015 version provided for requests for treatment to be emailed directly to Dr. Amonette. The same treatment exclusion criteria applied as in the June 2015 version.

---

[1]  At oral argument, the Court inquired which edition of the Guidelines is being challenged. Plaintiff responded his challenge was "under all of them." But the pre-June 2016 Guidelines are no longer in effect, and the Complaint seeks prospective (rather than retrospective monetary) relief, meaning that only claims relating to the latest version remain live.

The June 2016 Guidelines were drafted and developed by Dr. Amonette and Dr. Sterling as well. This time, however, Scott and another VDOC official (not Schilling) approved them because, by April 2016, Schilling was no longer the VDOC's Health Services Director. Once again, Dr. Amonette was designated as the "sole individual who can refer inmates" to the Clinic, and the qualification and exclusion criteria remained the same.

Plaintiff alleges that each version of the Guidelines failed to follow the AALDS recommendations that all patients with chronic Hep C receive treatment with DAADs. Schilling, Scott, and Sterling "drafted and approved" the Guidelines "which are contrary to prevailing medical authority." Plaintiff further alleges that Dr. Amonette has refused to refer him to VCU's telemedicine clinic "under the Hep[] C treatment guidelines developed and implemented by . . . Sterling, Schilling, . . and Scott," and that those guidelines "do not comply with prevailing medical standards."

## ANALYSIS

### I.       Former-Director Schilling

The claims against Schilling are moot because he is no longer employed as VDOC's Health Services Director and there are no damages claims against him.[2] Plaintiff does not contest this conclusion as to injunctive relief. (Dkt. 65 at 16). He does, however, argue that his request for declaratory relief against Schilling remains live, citing a Ninth Circuit case, *Washington Initiatives Now v. Rippie*, 213 F.3d 1132 (9th Cir. 2000). *Rippie*, however, contains no analysis of the issue here—whether declaratory relief can be obtained against a former official. Indeed, the question does not appear to have been presented in *Rippie*, which dealt solely with substantive First Amendment analysis.

---

[2]       At oral argument, the parties represented to the Court that Schilling had been rehired and was on the VDOC payroll, but in a capacity that does not bear on the issues in this case.

Declaratory judgments are used to clarify the parties' rights and legal relations. *See Hanback v. DRHI, Inc.*, 647 F. App'x 207, 209–10 (4th Cir. 2016) (quoting *Centennial Life Ins. C. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996)). "The purpose of a declaratory judgment is to 'declare the rights of litigants.' The remedy is thus by definition prospective in nature." *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 628 (3d Cir. 2013) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). "By itself, a declaratory judgment cannot" provide redress that keeps a claim alive, but rather a plaintiff "must identify some further concrete relief that will likely result from the declaratory judgment." *Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993).

This Plaintiff cannot do. He has no damages claim against Schilling, and since Schilling is no longer employed by VDOC in a roll that relates to Plaintiff's claims, there cannot be any meaningful relief against him in an official capacity. A declaratory judgment would, at bottom, serve no useful purpose and would, in fact, be an advisory opinion as to Schilling. *See id.* at 514; *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004). When a declaration would have no meaningful effect in the world—for instance, because the relief sought by a plaintiff against a defendant is no longer available—courts find that the claims against that defendant are moot. *E.g.*, *Centro Familiar Cristiano Buenas Nuevas v. City of Yuma*, 651 F.3d 1163, 1167–68 (9th Cir. 2011); *Jordan v. Sosa*, 654 F.3d 1012, 1030 (10th Cir. 2011) (declaratory judgment "would amount to nothing more than a declaration that [plaintiff] was wronged, and would have no effect on the [defendant's] behavior"); *id.* at 1032 (inquiring if declaratory relief "will have any effect in the real world"). Schilling will therefore be dismissed from the case without prejudice, as is proper when there is no jurisdiction. *See Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 222 (4th Cir. 2001).

## II.    Dr. Sterling

Dr. Sterling filed his own motion to dismiss.  Although phrased as both a standing inquiry (redressability) and a merits problem, the nub of his argument is that he simply doesn't have anything to do with the lack of treatment for Plaintiff.  Instead, he treats whoever Dr. Amonette and VDOC refer to him.  He is not the one that makes the referral.  This argument is well taken.  Dr. Sterling is not a VDOC employee, and he does not approve or administer the Guidelines that Plaintiff challenges.  He is merely the outside physician who provides treatment to whomever the VDOC sends his way.  As the Complaint makes clear, it is the VDOC Defendants who approve and have final signatory authority for the Guidelines, and it is Dr. Amonette who makes the ultimate referral decision.  (Complaint ¶¶ 8–10, 44–47, 50, 54–55, 58).  Dr. Sterling just oversees the Clinic.  (*Id*. ¶ 11).  He has no decision-making or policy-making role.  The complaint, for instance, alleges that it is Dr. Amonette who "is the sole decision maker in determining which inmates will be referred for Hepatitis C treatment" and who "solely determines" which inmates go to the Clinic.  (Complaint ¶¶ 5, 39).

The theory in this case is not that Plaintiff was referred to Dr. Sterling, *who then failed to provide constitutionally adequate care*.  Rather, it is that the Guidelines, and the VDOC Defendants' implementation of them, *frustrate Plaintiff's access to treatment from Dr. Sterling at all*.  Dr. Sterling can only see the inmates who the VDOC Defendants allow him to see.  It would be truly bizarre to conclude that an outside doctor violates the Constitution for failing to treat an inmate that the jailers have never permitted him to treat.

In his brief, Plaintiff contends that Dr. Sterling "has the authority to revise the treatment guidelines," (dkt. 64 at 10), and thus he is in some way accountable for Plaintiff's lack of medical treatment.  This assertion is absent from the Complaint and indeed entirely inconsistent

6

with its allegations about the authority of the VDOC Defendants to give final approval to the Guidelines.

Lastly, Plaintiff contends that Dr. Sterling has violated the Constitution because he "was instrumental in developing the treatment guidelines by which Reid was denied treatment." (Dkt. 64 at 15). Plaintiff framed this issue at oral argument as Dr. Sterling having "set up the prism" through which this lawsuit and the failure of treat must be viewed. The Court is unconvinced. As stated above, the Complaint is unambiguous that the VDOC Defendants are the ones who approve, sign, and implement the Guidelines. That Dr. Sterling was "personally involved in the development" of the Guidelines (dkt. 64 at 20)—a nebulous phrase that could apply just as well to the typist who transcribed them, or the editor who proofread them, or any person who provided input or suggestions—is simply irrelevant to who is liable for the Guidelines' institution and application to Plaintiff. Dr. Sterling will be dismissed from the case.

## II. Deputy Director Scott

Finally, Defendant Scott presents a thornier issue. He argues on the merits that the complaint contains insufficient facts to demonstrate his liability for an Eighth Amendment violation. According to Scott, the allegations against him involve only his development and approval of the Guidelines, but there is no allegation about his "direct involvement" in the failure to provide Hep C treatment to Plaintiff. (Dkt. 61 at 7). Scott, for instance, says there is no basis in the complaint to conclude he "specifically had knowledge of Plaintiff's medical condition," or his lack of treatment, or that Scott "made any treatment decisions with respect to Plaintiff's [Hep C] or w[as] involved in his denial of treatment." (*Id*.; dkt. 57 at 4).

Plaintiff disagrees. He contends Scott had "direct involvement in violating his constitutional rights" and was aware of and disregarded an excessive risk to his health and safety.

(Dkt. 65 at 2). This is based on Scott's drafting, development, and approval of the Guidelines, including his role as the official who has final signatory authority over them. (Dkt. 65 at 9–10). Plaintiff contends Scott drafted and approved the Guidelines with awareness that they are contrary to prevailing medical authority and recommendations for Hep C treatment. (Dkt. 65 at 8). Accordingly, Plaintiff says Scott is "connected to the failure to treat" him.

In considering these arguments, it is necessary to distinguish two types of liability against an individual under § 1983: direct and supervisory. Plaintiff here as disclaimed the latter theory and instead is proceeding only under a direct liability theory. (Dkt. 65 (Pl's Br.) at 2 ("Reid is not pursuing . . . Scott for supervisory liability, but for [Scott's] direct involvement in violating his constitutional rights")). That approach is particularly notable since Scott, the Deputy Director of Administration, is the supervisor of Defendants Amonette, Schilling, and Stephen Herrick (the VDOC Health Services Director), Complaint ¶ 10, and thus more removed from decisions on the ground than those Defendants.

The issue is what level of knowledge, and the specificity of that knowledge, is required for liability under the Eighth Amendment. "A prisoner seeking to prove a violation of the Eighth Amendment must satisfy," among other things, a subjective requirement of showing that the defendant had a "sufficiently culpable state of mind." *Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). As to that element, "the Supreme Court has recognized that to be held liable under the Eighth Amendment, the prison official must have had a criminal-law *mens rea*." *Anderson*, 877 F.3d at 544. This "criminal-law recklessness" means the official must (1) know of and disregard an excessive risk to inmate health, (2) "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and" (3) "must also draw the inference." *Id*. at 544. The official must "consciously disregard" the "known risk of serious

8

harm." *Id*. "An accidental or inadvertent response to a known risk is insufficient to create Eighth Amendment liability." *Id*.

Critically, "it is not enough that an official *should* have known of a risk; he or she must have had *actual subjective knowledge* of both *the inmate's* serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (first emphasis in original); *see Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis in original) (explaining that "*actual knowledge of the risk of harm* to the inmate is required," and beyond that "the officer must *also* have recognized that *his actions were insufficient* to mitigate the risk of harm to the inmate arising from his medical needs" (emphasis in original)); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (Deliberate indifference "requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm.").

The core question, then, is what does it mean for Scott to have had "actual subjective knowledge" of Plaintiff's Hep C?  Bear in mind, again, that Plaintiff is advancing only a direct liability claim, rather than supervisory one.  For defendants at a policymaking level like Scott, must they have actual subjective knowledge of *this particular inmate's* Hep C infection and its severity, or is it enough for them simply to know that there is some class of inmates have Hep C and might not fall within their policy?  To put a finer point on it, did Scott have the requisite knowledge of Plaintiff's Help C simply by developing and giving his final approval to Guidelines that are alleged to be contrary to the prevailing medical judgment for Hep C?

One recent case concluded not, as it dismissed certain defendants where the inmate did not allege they "had actual knowledge of *his* mental health conditions." *DePaola v. Clarke*, 884 F.3d 481, 488 (4th Cir. 2018) (emphasis added); *see id*. at 486 (explaining that deliberate

9

indifference exists if the defendant has "actual knowledge of the prisoner's" serious medical needs). In *DePaola*, the Fourth Circuit found that the plaintiff stated a deliberate indifference claim against six defendants because he alleged that "these defendants had notice of *his*" various mental afflictions based on a prior suicide attempt that required "mental health officials" at the prison to respond and thus "plainly put prison officials on notice" that he required mental health treatment. *Id*. at 488 (emphasis added). Critically, the plaintiff asserted that "he thereafter sought help repeatedly from these six defendants." *Id*. But the court continued to explain that, "[w]ith regard to the other defendants," the plaintiff "did not allege in his complaint that any of the other defendants had actual knowledge of his mental health conditions, leaving his claim against them insufficient as a matter of law." *Id*.

In light of the foregoing, the Court concludes that the complaint does not state a direct liability claim against Scott. The complaint contains seventeen paragraphs of allegations detailing Plaintiff's diagnosis and requests for treatment. (Complaint ¶¶ 14–31). Although those allegations reveal that Defendants Amonette, Shipp, Booker, and Herrick specifically gained knowledge of Plaintiff's condition through various requests or administrative appeals made to them, *id*. ¶¶ 19, 21, 28–30, nowhere is it alleged that Scott knew of Plaintiff's condition.

Plaintiff instead points to a paragraph elsewhere in the complaint where he alleges generally that "Defendants are aware of Plaintiff's condition . . . ." (Complaint ¶ 64; dkt. 65 at 8). But this generic allegation is insufficient. Courts in the Fourth Circuit and elsewhere "have interpreted *Twombly* and *Iqbal* to mean that generic or general allegations about the conduct of 'defendants,' without more, fail to state a claim." *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619, 626 (W.D. Va. 2015) (compiling cases); *e.g.*, *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (use of "collective term 'Defendants'" not proper pleading practice); *Bryson v.*

*Gonzales*, 534 F.3d 1282, 1290 (10th Cir. 2008) ("conclusory allegations that simply name the 'Defendants' generically" fail to state claim); *Evans v. Chalmers*, 703 F.3d 636, 661 (4th Cir. 2012) (Wilkinson, J., concurring).[3]

The boilerplate allegation about the awareness of unspecified "Defendants" starkly contrasts other portions of the complaint referenced above that allege discrete events involving specific defendants that imparted knowledge of Plaintiff's condition. Moreover, just three paragraphs after the generic allegation about the awareness of unspecified "Defendants," Plaintiff identifies Defendants Booker, Shipp, and Amonette as having knowledge of his condition. (Complaint ¶ 67).

Finally, Plaintiff relies upon Scott's role in developing and approving the VDOC Guidelines, pursuant to which he claims *others* denied him treatment. The argument is essentially that (1) Scott developed and approved Guidelines, knowing that they were medically insufficient, and (2) he knew that they would be applied to any Hep C-infected inmate in Virginia, so (3) "from these facts" the Court can infer Scott "knew of an excessive risk and potential harm to inmate health and safety created by the" Guidelines. (Dkt. 65 at 15–16). But this argument overlooks what *DePaola* indicates is important—knowledge of *this plaintiff's* condition. That is especially important since Plaintiff has renounced a supervisory claim against Scott, which more naturally fits with an argument relying on Scott's involvement at the

---

[3]    *E.g.*, *Raub v. Bowen*, 960 F.Supp.2d 602, 616 (E.D.Va. 2013) (concluding "vagaries" in "ambiguous" false imprisonment count asserted against "one or more Defendants" warranted dismissal); *Boykin Anchor Co. v. AT & T Corp.*, No. 5:10–CV–591–FL, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011) (holding "plaintiff cannot rely on bare allegations relating to the conduct of 'all defendants'"); *Maisha v. Univ. of N. Carolina*, No. 1:12–CV–371, 2013 WL 1232947, at *6 (M.D.N.C. Mar. 27, 2013) (dismissing claims where complaint "was often vague as to who took what action" and made "no specific allegations" against certain defendants); *Baca v. Callahan*, No. CV–10–885–PHX–GMS, 2010 WL 2757251, at *1 (D.Ariz. July 12, 2010) (dismissing complaint against ten defendants that did "little to clarify each Defendant's role in the underlying transaction").

policymaking level. *See Wilkins v. Montgomery*, 751 F.3d 214, 226–27 (4th Cir. 2014) (setting forth contours of supervisory liability in deliberate indifferent context, indicating supervisory liability requires knowledge of subordinates' actions, and explaining causation may be satisfied "where the policy commands the injury of which the plaintiff complains").

Plaintiff cites several unpublished, out-of-circuit district court cases he believes support his position that being involved in crafting and approving a policy is sufficient to hold a state actor liable for an Eighth Amendment violation. (Dkt. 65 at 13–15). In *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, (M.D. Pa. Jan. 3, 2017), a district court enjoined the failure to provide DAADs to Hep C inmates. Plaintiff asserts that this case shows that Scott can be enjoined because the Secretary of Pennsylvania's Department of Corrections, Wetzel, was enjoined even though he was not on the Hep C "Treatment Committee" that made decisions about prisoner treatment. Plaintiff overreads the case. First, the court's findings of fact and its analysis did not mention Wetzel or otherwise suggest its ruling applied to Wetzel. Second and relatedly, the court made clear that it was addressing the knowledge and failure to treat by the "Defendants that sit on the Hepatitis C Treatment Committee," *id*. at *9, 11; *see id*. at *15–16, 18, and Wetzel was not one. *Id*. at *6; *see Allah v. Thomas*, 679 F. App'x 216, 220 (3d Cir. 2017) (affirming dismissal of "non-medical defendants because there are no allegations that these prison officials were involved in any of the decisions regarding the non-treatment").[4]

---

[4]    *Chimenti v. Pennsylvania Dep't of Corr.*, No. CV 15-3333, 2017 WL 3394605, at *13 (E.D. Pa. Aug. 8, 2017), is similarly unhelpful because it contains no discussion of Secretary Wetzel's personal role in formulating policy or denying treatment. It is thus impossible to draw any meaningful comparison to Scott's role in this case.

   *Hoffer v. Jones*, 2017 WL 5586878 (N.D. Fla. Nov. 17, 2017), also provides little support to Plaintiff. The issue currently before the Court—the level and sufficiency of Scott's knowledge—was not analyzed in *Hoffer*. *Id*. at *5 (summarily concluding that "[t]here is no question that Defendant has knowledge of a risk of serious harm—Defendant knows that Plaintiffs and Plaintiffs' class are diagnosed with HCV.").

Plaintiff's best case is *Postawko v. Missouri Dep't of Corr.*, No. 2:16-CV-04219-NKL, 2017 WL 1968317 (W.D. Mo. May 11, 2017), for it stated that a Department of Corrections' Director "implemented, authorized, or condoned the treatment policies" alleged to be unconstitutional, "which plausibly makes [her] liable despite the fact that [she] did not personally treat or manage" plaintiffs' Hep C. *Id.* at *10. But that rather conclusory statement was the entirety of the court's analysis—it did not specifically address the "actual knowledge" inquiry required by Fourth Circuit caselaw. And, it was based on a supervisory liability theory of liability, *id.* at *10 (citing *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989) (providing for § 1983 liability when "official fails to properly train, supervise, direct or control the actions of a subordinate who causes the injury")), which Plaintiff has expressly disclaimed. (Dkt. 65 at 2).[5]

As a result, the Court will dismiss the claims against Defendant Scott.

\*　　\*　　\*

Defendant Schilling will be dismissed without prejudice because the claims against him are moot, on account of the fact that the relief sought cannot be obtained from him. The claims against Dr. Sterling and Scott will be dismissed with prejudice.

The Clerk of the Court is directed to send a certified copy of the Order to all counsel of record.

Entered this __31st__ day of May, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[5]　This point also distinguishes Plaintiff's reliance on *Henderson v. Tanner*, 2017 WL 1017927, at *4 (M.D. La. Feb. 16, 2017), which refused to dismiss (but without elaboration) a claim against policy-makers who had no direct role in treating the plaintiff but were "involved with making policy determinations regarding treatment protocols."