IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ELMO AUGUSTUS REID,<br><br>                              *Plaintiff,*<br><br>v.<br><br>HAROLD CLARKE, *ET AL.*,<br><br>                             *Defendants.* | CIVIL ACTION NO. 7:16-cv-00547<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Elmo Reid has chronic Hepatitis C. He is also imprisoned by the Virginia Department of Corrections (VDOC). He desires treatment for his condition. VDOC previously approved treatment, but the then-standard drug regimen was unsuccessful. A new treatment, with a 90% efficacy rate, became available. So Reid asked for it. VDOC officials denied his request, preventing him from being referred to VDOC's outside hepatologist. They relied upon VDOC's internal Hepatitis C policy. Under that policy, if (like Reid) an inmate with chronic Hepatitis C never exceeds certain testing benchmarks, he or she will never be referred to the hepatolgist for treatment with the new drugs. Reid thus filed this lawsuit asserting that VDOC officials are acting with deliberate indifference to his serious medical needs, in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. He seeks only injunctive relief: He wants to be referred to VDOC's outside hepatologist who approves and provides the medicine.

The defendants—VDOC's Director of Health Services Stephen Herring, VDOC's Chief Physician Mark Amonette, Bernard Booker (the warden at Reid's prison), and Pamela Shipp (the health policy liaison at Reid's prison)—seek summary judgment. Because the evidence permits a reasonable factfinder to conclude that VDOC's policy, and Defendants' application of it to Reid, violates the Eighth Amendment, the motion will be denied.

1

At summary judgment, the Court must take the facts and inferences in the light most favorable to Reid (Plaintiff), the non-moving party. *Grutzmacher v. Howard Cty.*, 851 F.3d 332, 341 (4th Cir. 2017). There is an objective and subjective component to an Eighth Amendment deliberative indifference claim. Objectively, was the medical condition a "serious medical need"? *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The parties do not dispute that Hepatitis C is a serious medical condition. So subjectively, then, was a defendant "deliberately indifferent" to the plaintiff's condition? *Id*. The background of this case is familiar to the parties, and the Court has already authored two opinions on dispositive motions. Moreover, save for issues like the precise severity of Plaintiff's disease and whether cost factored into VDOC's denial of treatment, the underlying facts are mostly undisputed. Thus, the Court provides a summary of the facts before quickly turning to each Defendant.

As explained above, Plaintiff has chronic Hepatitis C (Hep C). For present purposes, the evidence shows he suffers from liver cirrhosis dating back to at least August 2013. (Dkt. 91-2). He is incarcerated at Buckingham Correctional Center (BCC), where the on-site physician in 2013 recommended—and Chief Physician Amonette approved—that he receive a drug regimen to treat his Hep C. (Dkts. 91-7, 91-8). Plaintiff received treatment from November 2013 to November 2014, but it was unsuccessful. (Dkt. 91-4 at 4).

Around that time, medical advances resulted in the availability of "direct acting antiviral" drugs (DAADs), a new Hep C treatment with far fewer side effects and a much higher efficacy rate than previous drugs. In 2014, Amonette suspended VDOC's treatment of Hep C prisoners with the old drugs while it awaited the availability of DAADs and developed new treatment policies.

In 2015, Amonette instituted a series of interim guidelines regarding Hep C treatment. These materials were promulgated by Amonette to each prison's "health authority" (essentially, the health policy liaison at each institution responsible for ensuring compliance), and from there to staff, including physicians. (Dkt. 91-14 at 61–62). Amonette and VDOC concomitantly arranged a relationship with Virginia Commonwealth University medical personnel, whereby VCU specialists would treat Hep C inmates who VDOC referred to them. Although each iteration varied somewhat, the interim guidelines contained medical testing benchmarks used to determine whether an inmate (1) was referred to VCU for Hep C treatment, (2) subjected to additional testing, or (3) simply monitored once or twice a year without referral to VCU for treatment. The interim guidelines also included "exclusion" criteria (*i.e.*, circumstances that would or could bar a prisoner from receiving treatment), such as drug or alcohol use, unauthorized tattoos, or a pending release date.[1]

At some point, Plaintiff became aware of DAADs and asked to receive them. On June 9, 2015, the BCC health authority, Pamela Shipp, informed Plaintiff that one his test scores did not meet the treatment criteria under VDOC's policy. (Dkt. 91-35). Plaintiff filed an informal complaint, and Shipp responded on June 23, 2015, writing "you are not approved [for] *nor need* the new Hep C treatment as you do not meet the requirements." (Dkt. 91-45 (emphasis added)). Plaintiff then appealed to Amonette, who responded by letter on July 6, 2015. Amonette wrote that Plaintiff fell into a "middle" category "in which it is unclear whether you require treatment for Hepatitis C at this time" and explained that further testing was required. (Dkt. 91-48).

---

[1] Since the middle of 2015, only 362 VDOC inmates have completed DAADs treatment, with a cure rate of 90 percent. (Dkt. 91-3 at 46–47). There are 105 pending appointments with the VCU clinic as of April 2018. (*Id.*). Of 770 applications for treatment to Amonette, 523 have been approved by him. (*Id.* at 48).

3

Plaintiff next received the additional testing, a fibroscan, which revealed mild liver disease. (Dkt. 91-11 at 236–37). Plaintiff was then told he was not eligible for treatment. (Dkt. 91-1 at 30–32, 39). The prison physician told Plaintiff that while he would approve treatment, the decision was Shipp's to make. (*Id*. at 54–55).

In 2016, Plaintiff filed a grievance seeking treatment again, but Shipp denied it on the grounds that he had a parole hearing scheduled within the next six months. (Dkt. 91-49). Defendant Booker, the warden at BCC, reviewed the grievance and deemed it unfounded based on the then-existing guidelines. (Dkt. 91-51). Plaintiff appealed, stating "to have a policy that estimate[s] whether I receive adequate medical treatment for non-medical reasons put[s] my future health at risk." (*Id*.). Director Herrick considered the appeal. (Dkt. 91-52). In October 2016, he overturned the decision, recognizing that there was no treatment exception in the current interim guidelines for a *potential* release (*i.e.*, a parole hearing), only actual release. According to Defendants, as of 2017 Plaintiff "was *ineligible* for treatment" due to his test scores. (Dkt. 82 at 11 (emphasis added)).

As this is a suit for injunctive relief from an alleged ongoing constitutional violation, current medical standards and VDOC's present guidelines are critical. The gold standard for liver disease and Hep C treatment comes from the American Association for the Study of Liver Diseases (AASLD). The AASLD issues its own guidelines that are updated periodically online and consulted throughout the medical community. The AASLD recommends treatment with DAADs for nearly all patients with Hep C—those with short life expectancies are considered on a case-by-case basis. (Dkt. 91-4 at 3). The treatment is effective in 90% of cases. (*Id*. at 2).

The May 24, 2018 version of the AASLD Guidelines provides: (1) for jails, "[c]hronically infected individuals whose jail sentence is sufficiently long to complete a

4

recommended course of antiviral therapy should receive treatment for chronic HCV infection according to AASLD/IDSA guidance while incarcerated," and (2) for prisons, "[c]hronically infected individuals should receive antiviral therapy according to AASLD/IDSA guidance while incarcerated." The AASLD Guidelines also say that "treating chronic HCV in incarcerated persons is cost-effective." Dr. Amonette testified that he found the AASLD qualified to make treatment recommendations about Hep C. (Dkt. 91-3 at 56–57).

As for VDOC, its most recent guidelines were issued in May 2018. "Requests for approval to refer for treatment [to VCU's clinic] should be sent" to the Chief Physician, Amonette. "Offenders with more advanced liver disease will be approved for treatment" based on their APRI and Fib-4 scores. (Those tests measure liver scarring, fibrosis, and platelets).

The testing benchmarks for treatment are as follows. If an inmate's APRI score is over 1.5 and Fib-4 is over 3.25, then he receives a priority referral for treatment evaluation. Inmates with lower scores fall in an "indeterminate group" where additional tests, such as a FibroScan, are run to determine the level of fibrosis in the liver and whether to proceed with treatment. Finally, for inmates with APRI under 0.5 and a Fib-4 under 1.45, treatment is deferred and the inmate receives monitoring. An offender must also have at least 7 months remaining on his sentence to receive the treatment. This is a reduction from the 9-month period in prior guidelines. (Dkt. 91-42).

The drug/alcohol exclusion criteria (which covers those who have used within the last two years) applies if the substance is "known to contribute to [the] progression of liver disease," although the guidelines add that this exclusion criterion will be considered on a case-by-case basis. The tattoo exclusion is retained, but also "determined case-by-case by the Chief Physician," Amonette. Amonette explains that the purpose of these exclusions is to deter

offenders who received treatment from behavior that would allow them to re-contract Hep C. (Amonette Dep. at 19).

Lastly, taking the facts in Plaintiff's favor, the issue of cost of DAADs is relevant. Amonette stated that, when he suspended treatment in 2014, VDOC had to decide whether "whether we would continue to manage it on our own as we had done for many, many years and develop a guideline and consider the impact of the cost of the medication . . . ." (Dkt. 91-3 at 57; dkt. 91-86 ("And then we had to consider cost. . . . We had to consider the impact of these very costly drugs on our budget and how that would be managed.")). Warden Booker is aware that DAADs are expensive. (Dkt. 91-27 at 53). Shipp told Plaintiff that the cost of the medications was an issue. (Dkt. 91-1 at 61). Shipp remarked that giving every inmate treatment was "a lot, [t]hat's a lot . . . costing the state a lot of money. I mean, that treatment's expensive, very expensive." (Dkt. 91-14 at 105–07).

*

This evidence permits a reasonable factfinder to conclude Amonette is deliberately indifferent to Plaintiff's condition. As Chief Physician, Amonette makes final decisions on VDOC medical policy. (Dkt. 91-25 at ECF 4). Amonette has actual knowledge of Plaintiff's Hep C. Moreover, his own prior medical judgment reveals that he knows Plaintiff should be treated: He previously approved it, under the old drug regimen that was far less effective and had more severe side effects.

Yet now, even with more efficacious and less harmful drugs, Amonette has denied and is denying Plaintiff treatment. What accounts for this change? Defendants argue that subsequent testing revealed Plaintiff's condition to not be as advanced or serious as originally thought. But Plaintiff's evidence, particularly Plaintiff's expert, contests this interpretation of the tests,

6

creating a dispute of material fact. So, when viewing the record in Plaintiff's favor, no legitimate reason has been offered. When an official—least of all a doctor—knows of a serious medical need yet fails to ensure it is treated, he can be found deliberately indifferent. *See*, *e.g.*, *Jehovah v. Clarke*, 798 F.3d 169, 174–75, 181–82 (4th Cir. 2015); *Jackson v. Lightsey*, 775 F.3d 170, 173, 179 (4th Cir. 2014); *De-Lonta v. Angelone*, 330 F.3d 630, 635 (4th Cir. 2003).

The Court confronts directly Amonette's contention that VDOC's policy simply "prioritizes" treatment. It does not. There is a difference between "everyone gets treatment but the worst get it first" and what VDOC's policy effectively says: "Only the sickest get treatment, and the rest must get sicker before we treat them." As Amonette rightly acknowledged at oral argument, if Plaintiff's Hep C does not get worse (as measured by VDOC's testing criteria), then he will *never* get treatment. Plaintiff is not on a list of inmates needing treatment, with worse-off inmates ahead of him. Rather, VDOC's policy currently puts him completely off the (hypothetical) waitlist. This is not a semantic difference. Plaintiff is categorically excluded from treatment by VDOC's policy. And this is so even though the prevailing medical judgment (including the AASLD and Plaintiff's expert) says he should receive treatment, even though there is a 90% likelihood he would be cured, even though there is medical evidence that delaying treatment risks reducing its efficacy, and even though Amonette previously identified Plaintiff as needing treatment. (*See*, *e.g.*, dkt. 91-4, 91-5).

Moreover, the policy Amonette wrote and implements contains non-medical reasons to not treat a patient—*e.g.*, disciplinary violations, drug use, or tattoos—rendering it more suspect.[2]

---

[2] Take a prisoner who cuts his own wrists. A prison would have little basis to refuse treatment on the grounds that he himself had created the harm, or that he might try to commit suicide again. Yet that seems to be the premise of VDOC's exclusion criteria.

7

And of course, there is some evidence that Amonette was sensitive to the cost of DAADs.[3] Taking all of these points into consideration, a factfinder could reasonably conclude that Amonette is acting with deliberate indifference to Plaintiff's serious medical need for Hep C treatment.

Amonette asserts he cannot be liable for deliberate indifference because he consulted with VDOC's outside hepatologist from VCU in creating the guidelines. (Dkt. 82 at 23). But the buck stops with Amonette. Amonette is the chief medical physician. Amonette writes and implements the offending guidelines. Amonette knows Plaintiff has Hep C. Amonette previously approved him for treatment. And it is Amonette, among others, who has applied the guidelines to Plaintiff, with the effect of denying him treatment. Amonette will not be dismissed from the case.

\* \*

Shipp, a nurse, is the health authority at BCC. She supervises everyone in the BCC medical department, ensuring that VDOC policies (including the Hep C guidelines) are complied with. (Dkt. 91-14 at 10, 13). Yet the Hep C guidelines are the only ones she has authority to apply directly to prisoners herself. (Dkt. 91-14 at 120). She contends that the prison doctor makes the relevant test calculations and then provides them to her. Nonetheless, she explicitly acknowledged that cost is an impediment to treatment, and she denied treatment (even when recommended by the prison physician) because VDOC policy said Plaintiff did not qualify for it. In other words, she directly applied to Plaintiff the policy he challenges as unconstitutional.

---

[3] As the Court observes, *infra*, it does not hold that cost is a *per se* verboten consideration. But Defendants have not explained why cost is a proper factor here, at least when considered along with the mosaic of other Plaintiff-friendly facts (*e.g.*, the refusal to treat despite prior approval, new medical standards, and better drugs).

All told, a reasonable factfinder could take the following facts and conclude Shipp was deliberately indifferent: (1) her initial denial of Plaintiff's request for treatment stated not only that he did not qualify for treatment but opined that he didn't "need" treatment, which was outside of her expertise; (2) when Plaintiff applied for treatment a second time, she erroneously applied the then-existing "parole exclusion" to deny treatment; (3) despite the reversal of that ruling by Director Herrick, Plaintiff received no treatment, even though the treating prison physician found it would be appropriate, and; (4) Shipp acknowledged that cost was a deterrent to treating Plaintiff as well as other inmates. Given these facts, a reasonable inference could be drawn that Shipp was deliberately indifferent to Plaintiff's medical needs.

Booker, the warden at BCC, shares some connection to Plaintiff's access to treatment. As of April 2018, there were 1,100 prisoners at BCC, at least 68 of them with Hep C, but only one of them was receiving DAADs. (Dkts. 91-14, 91-27, 91-43). Booker oversees "the entire operation and function of the institution" and its "well-being." (Dkt. 91-27 at 6). Under VDOC policy, a warden and a prison's health authority (here, Shipp) will, "in conjunction," ensure that offenders have timely and adequate health care. (Dkt. 91-28 at ECF 2). Booker also reviews medical grievances. (Dkt. 91-27 at 14). Booker knows Plaintiff has Hep C, and he knows it is a serious medical condition. (Dkt. 91-27 at 66). He signed the original denial of Plaintiff's request for treatment on Shipp's recommendation that it did not comply with VDOC policy. (Dkt. 91-27 at 33–34, 36, 42–43). Booker feels he must follow VDOC's guidelines no matter what and has no discretion to go beyond them. (Dkt. 91-27 at 37).

As explained above regarding Amonette, a factfinder would be justified in concluding the VDOC's guidelines evince deliberate indifference towards Plaintiff's Hep C. Warden Booker has been involved in the application of the guidelines to Plaintiff. He knows Plaintiff has Hep C,

9

and he knows Hep C is a serious medical issue. Also, as warden, his involvement and cooperation could be necessary to effectuate injunctive relief the Court may order. For those reasons, he will not be dismissed at this time.

\* \* \*

That brings us to Director Herrick. He supervises Amonette, and has in the past handled financial information about the cost of treatments and budgeting for Hep C. (Dkts. 91-67). Herrick reviewed a grievance by Plaintiff about failure to provide Hep C treatment, and Herrick concluded that the grievance was founded because it misapplied VDOC's guidelines regarding release dates. (Dkt. 91-26). Otherwise, Herrick has had little *direct* involvement with the decision whether to treat Plaintiff, being as he puts it in his brief a "policy supervisor[]" who was not "personally involved in the application or denial of medical treatment," and who relied on Dr. Amonette for clinical decisions regarding medical policy-making. (Dkt. 82 at 19).

Plaintiff, however, argues that supervisor liability applies to Herrick. (Dkt. 91 at 29). This theory requires proof "(1) that the supervisor had actual or constructive knowledge that [his or her] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

Plaintiff points out that Herrick knew of Plaintiff's Hep C because Herrick concluded Plaintiff's original grievance was founded. (He also faults Herrick for failing to directly order that Plaintiff be referred for treatment.) He then argues that Herrick (as a career health

administrator) knew of the importance of and existing impediments to (*e.g.*, delays, small number of treatment slots at VCU) treating prisoners with Hep C. (Dkt. 91 at 29).

Herrick does not respond to Plaintiff's supervisory liability argument. He instead focuses on his lack of personal involvement with the denial of treatment to Plaintiff and argues he was entitled to rely upon Amonette's medical judgment in formulating the guidelines. Without meaningful argument from Herrick at this stage, this theory can proceed to trial. Herrick knew Plaintiff had Hep C. And despite finding his grievance warranted, he did not order or ensure that Plaintiff receive treatment, standing by while his subordinate, Amonette, drafted and applied a medically deficient policy. This arguably satisfies the second element of supervisory liability—*i.e.*, inadequate response. And third, proof of causation may exist "where the policy commands the injury of which the plaintiff complains." *Wilkins*, 751 F.3d at 226–27. Since the subsequent denials of treatment were a function of the policy that Herrick's subordinate had created and (already once incorrectly) implemented, a reasonable fact-finder could infer causation.

\*   \*   \*   \*

Finally, in anticipation of trial, Plaintiff moved to exclude Defendants' three experts, Drs. Zawitz, Kendig, and Morrison. The motion veers from complaints about cumulativeness, to failure to consider (what Plaintiff believes are) the proper facts, to using an incorrect standard of care. The Court's *Daubert* analysis[4] functions "to ensure that an opinion offered by an expert is

---

[4] An expert qualified "by knowledge, skill, experience, training, or education, may testify" as to scientific, technical, or other specialized knowledge if it will assist the trier of fact. Fed. R. Evid. 702. Such testimony is only admissible if (1) "the testimony is based upon sufficient facts or data," (2) "the testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." *Id.* "[A] court may consider whether the expert witness theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; and (4) is generally accepted within a relevant scientific community." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (citation and internal quotation marks omitted); *Daubert*

reliable." *Nease v. Ford Motor Co.*, 848 F.3d 219, 230 (4th Cir. 2017. In bench trials, the Court has discretion in how to perform its gatekeeping role: "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); *see also Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004); 29 Wright & Miller, *Fed. Prac. & Proc. Evid*. § 6270 (2d ed.). One way to utilize this discretion is to "admit expert testimony subject to excluding it later if the court concludes it is unreliable." 29 Wright & Miller, *Fed. Prac. & Proc. Evid*. § 6270 (2d ed.); *see, e.g., In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).

1. Plaintiff first asserts that the experts' opinions are based on "the faulty factual premise that the VDOC guidelines prioritize treating the sickest individuals." (Dkt. 77 at 4). In Plaintiff's view, the guidelines don't prioritize treatment, they exclude certain inmates altogether from it. While there may ultimately be truth to Plaintiff's contention, "arguments about the factual basis of an expert's opinion normally go to its weight and not its admissibility." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 195 (4th Cir. 2017); *e.g.*, *Estate of Godley v. Comm'r*, 286 F.3d 210, 214-15 (4th Cir. 2002). The Court, sitting as the finder of fact, is plenty capable of assessing what the proper interpretation of the guidelines is and then crediting (or discounting) an expert's opinion accordingly. This is similarly true regarding Plaintiff's related argument that the experts equate the VDOC guidelines with the guidelines from the federal Bureau of Prisons. (Dkt. 77 at 5–6).

2. Without any citation to the record, Plaintiff next asserts that "the doctors opine that the cost of the treatment is a factor that must be considered when determining the constitutionality of the standard of care, and that cost can be a legitimate basis for prioritizing or

---

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993). This list of factors is not exhaustive. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

deferring treatment." (Dkt. 77 at 6). He cites a Florida district court case for the proposition that cost (presumably alone) "is not an appropriate basis for denying treatment." (*Id*.). But regardless, he says, Defendants have maintained that cost has not been a factor. Thus, so the argument goes, "the experts relied on faulty or insufficient facts in forming their opinions."

To the extent this argument is premised on the "faulty or insufficient facts" notion, it falls within the previous analysis—*i.e.*, an argument that goes to weight and not admissibility. *Bresler*, 855 F.3d at 195. The real crux, however, seems to be that an expert opinion that views cost as a legitimate factor in medical decisions must be excluded, because considering cost is *per se* inappropriate. But that is not correct. *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997); *McCabe v. Pa. Dep't of Corr.*, 523 F. App'x 858, 860 (3d Cir. 2013); *see Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011); *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016); *id*. at 736 (Easterbrook, J., dissenting).

3. Plaintiff also attacks Dr. Zawitz's opinions as unsupported. As characterized by Plaintiff's brief (again, there are no citations to the record), Zawitz opines that Reid: does not have cirrhosis or any of its signs; probably got Hep C in 1988; probably will never progress to a higher degree of fibrosis; and may never be at risk. (Dkt. 77 at 6–7). Plaintiff asserts that these conclusions are "nothing more than a chain of conjecture," and "purely hypothetical" with "no factual basis." (*Id*. at 7).

Zawitz is a board-certified physcian in infectious disease and internal medicine, with a residency at the University of Pittsburg and a fellowship in infectious diseases. (Dkt. 77-1 at 1). He is the full-time infectious disease/internal medicine doctor at the Cook County jail. In preparation of his report, he reviewed discovery productions and responses, VDOC policies and medical records, depositions, and medical industry standards on Hep C, among other things. (*Id*.

13

at 3–4). Zawitz reviewed Plaintiff's medical records specifically from the 1980s (when he was diagnosed) and stated that the VDOC medical records "most relevant" to his review began in November 2012.

Zawitz emphasized that only one test (a non-invasive "Fibrosure" test) indicated any cirrhosis. "All other objective testing (liver ultrasound, APRI calculations, Fibroscan, Fib-4, and all clinical examination records) indicated Mr. Reid has minimal to zero fibrosis and no signs or symptoms consistent with cirrhosis." (*Id*. at 7). Thus, it is Zawitz's opinion that Plaintiff has no cirrhosis, and he explains that conclusion by explaining the accuracy, reliability, and limitations of the various tests used. (Dkt. 77-1 at 12–15).

Plaintiff, of course, disagrees with this conclusion. But what we have here is a difference of medical opinion based on different ways in which a medical professional might interpret the underlying medical data. That is not a basis to exclude Zawitz's opinion.

Similarly, Plaintiff criticizes Zawitz's conclusion that Plaintiff displays no outward symptoms of cirrhosis, arguing that it is contradicted by facts in the record such as Plaintiff's reporting of fatigue, discomfort, and adnominal pain. (Dkt. 77 at 7–8). But again, this is a factual squabble that goes to the weight of the opinion and not its admissibility, *Bresler*, 855 F.3d at 195—Plaintiff can cross-examine Zawitz to see if he considered those reported symptoms and, if so, why he did not believe there is evidence of cirrhosis.

Zawitz also concludes that there has been little to no advancement of Plaintiff's Hep C since he was first documented to have the disease in the late 1980s. From this, he concludes, based on "published data," it is reasonable to believe that Plaintiff's liver "may never progress to a higher degree of fibrosis." (Dkt. 77-1 at 16). Zawitz finds this "relevant, as it concerns assessment of whether or not a temporary deferral of treatment put Mr. Reid at significant risk of

harm." (*Id*.). Plaintiff argues that this is "nothing more than . . . conjecture" and "exactly the kind of testimony that should be excluded because of its tendency to mislead the finder of fact." (Dkt. 77 at 7). But Zawitz has explained that his view is supported by published data, and he is generally qualified by both training and inexperience in this area—*i.e.*, correctional healthcare and Hep C.

4. Next, Plaintiff objects to Zawitz's and Kendig's reliance on a "correctional standard of care," which, citing district court cases, he claims is inappropriate. (Dkt. 77 at 5). Defendants' brief sparsely replies. They explain (without citation) that Zawitz and Kendig rely upon a "correction standard of care" to justify their opinions, and that Zawitz states that such a standard of care is whether appropriate in a correctional setting where the issue is to treat now or defer treatment. But these responses are *non sequiturs*: The issue raised by Plaintiff is whether a "correctional standard of care" is the proper one.

Nonetheless, the district court cases cited by Plaintiff on this point (*i.e.*, "the standard of care should not be different in a correctional setting") are far from strong. The key statement in one case—"Defendants have offered no authority that the standard of care is different in the correctional setting"—was passive and made only in the context of deciding whether a doctor without correctional medicine experience could conceivably be qualified as an expert. *Maley v. Corizon Health, Inc.*, No. CV416-060, 2018 WL 797441, at *2 (S.D. Ga. Feb. 8, 2018); *e.g., Thornhill v. Aylor*, No. 3:15CV00024, 2017 WL 4770950, at *3 (W.D. Va. Oct. 19, 2017). In another Hep C prisoner case cited by Plaintiff, the district court treated the appropriate standard of care as an issue of fact informed by the opinions of expert doctors, and which the court itself identified as "evolving." *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *4, 15, 19 (M.D. Pa. Jan. 3, 2017). Indeed, at least one district court in the Fourth Circuit has permitted

15

expert testimony when a nurse's "opinions concern specialized knowledge in the area of providing medical care . . . in a correctional setting. Such knowledge bears on whether Defendant had a duty to [plaintiff], as well as the standard of care and whether Defendant adhered to it." *Slaton v. Correct Care Sols., LLC*, No. CV 3:15-00627-JMC, 2016 WL 3257660, at *2 (D.S.C. June 14, 2016). And Plaintiff's sole circuit case (1) was from the Eleventh Circuit, (2) involved nurses rather than doctors, (3) was addressing the argument that a provider without experience in correctional medicine was unqualified, (4) provided no authority supporting its proposition, and (5) seemingly turned on Georgia state law. *McDowell v. Brown*, 392 F.3d 1283, 1297 (11th Cir. 2004). All told, without binding or compelling persuasive precedent to rely upon, and as this is a bench trial, the Court will not exclude this expert testimony at this time.

5. Lastly, in a paragraph at the end of his brief, Plaintiff seeks to exclude Defendants' experts as cumulative and asks that only one expert be permitted to testify. Plaintiff's sole analysis is the bald statement that the testimony of all three experts "will not assist the trier of fact." They do no analyze the substance of the experts' reports or compare their backgrounds. Defendants respond that their experts are only cumulative in the sense that they offer the same conclusion (that VDOC is acting appropriately, medically-speaking), and emphasize that the issues on which they will testify go to the heart of the case. In light of Plaintiff's meager argument and the importance of the issues, the Court will not exclude the experts at this time and defer any cumulativeness or waste-of-time objections to trial.

* * * * *

For the foregoing reasons, the Court will deny Defendants' motion for summary judgment and Plaintiff's *Daubert* motion. An appropriate order will issue.

Entered this __30th__ day of July, 2018.

_Norman K. Moon_
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE